STATE OF NEBRASKA, APPELLEE, v. THOMAS A. WILSON, APPELLANT.

406 N.W.2d 123

Filed May 22, 1987.   No. 86-777.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and Marie C. Pawol, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

The defendant, Thomas A. Wilson, was charged with first degree murder in the shooting death of his son, Robert Paul Wilson, and with use of a firearm in the commission of a felony. He was found guilty of second degree murder and sentenced to imprisonment for 35 years on count I and 6 to 20 years on count II, the sentences to run consecutively. He has appealed and contends the trial court erred (1) in allowing the testimony of Christine Wilson and Joseph Lang, Sr., regarding their knowledge of a Florida robbery; (2) in receiving exhibits 1 through 4; and (3) in receiving exhibit 37 into evidence.

The victim, who was known as Bobby Wilson, died from a single gunshot wound to his chest inflicted while visiting the defendant's Omaha, Nebraska, home on August 31, 1983. The only surviving witnesses to the incident, the defendant and Christine Wilson, the defendant's wife at the time of the shooting, originally reported that Bobby had shot himself following an argument with the defendant. Similar stories were reported in taped statements by the Wilsons the day after the shooting. Following these statements, the police closed the case as a suicide.

In September of 1985, Christine Wilson came forward with a different version of the shooting. According to Christine's testimony at trial, she and the defendant were in bed on August 31, 1983, when Bobby Wilson knocked on the front door. The defendant answered the door and after 5 to 10 minutes, the two men began to argue. The defendant yelled at Bobby, "[H]ow could you do that" and "there were other people that had to be paid and it wasn't right." Bobby responded that "Tommy was too old, he couldn't handle it any more, he couldn't do the job any more."

When Christine walked through the dining room on the way to the bathroom, she saw the two men near the front door in the living room. They stopped arguing as she passed by. After she

had returned to the bedroom, Christine heard the two men begin to argue again. Bobby became very angry and stated that he was leaving. Christine heard the front door open and then the defendant, in a conciliatory tone of voice, asked Bobby to stay. Bobby said okay and the door was closed. Then Bobby screamed, "[D]ad, no," and there was a shot fired. Christine ran to the dining room and saw Bobby on his knees leaning against the wall by the front door. Bobby was pleading with his father, who was holding a gun 5 inches from Bobby's head, not to kill him.

Christine began screaming at the defendant not to shoot. The defendant backed away from Bobby, who then began to plead for an ambulance. Christine started toward the telephone, but was ordered to stop by the defendant. The defendant then offered to call an ambulance if Bobby promised to say he had shot himself. Bobby agreed, and an ambulance was summoned. Christine was instructed to say that Bobby had shot himself. By the time the rescue team arrived, Bobby's state of consciousness was confused. Upon his arrival at the hospital emergency room, Bobby stated that he did not wish to die. Rescue efforts were unsuccessful, and Bobby died at 8:54 that evening. Christine testified that on the following day the defendant demonstrated how he had shot Bobby.

Apparently, the argument leading to Bobby's death stemmed from the robbery of a drug dealer in Florida during the summer of 1983, in which the defendant, the victim, and Joseph Lang, Sr., were involved. Lang and the defendant flew to Miami, Florida, that summer, where they met Bobby. According to Christine, the defendant had been hired to rob a drug dealer there. About a week after arriving in Florida, the defendant returned to Omaha alone, stating to Christine that he had come home to rest, but was planning to return to commit the robbery.

Lang and Bobby remained in Florida another 2 or 3 weeks before Bobby individually obtained the sought-after money. After the two men returned to Omaha, Bobby gave Lang $6,000 for himself and an envelope for the defendant. Bobby then left town. Lang delivered the envelope to the defendant the next day. The defendant became angry when he received the envelope because it contained only $6,000. According to

Christine, the defendant could not understand how Bobby could "do that to him" when it was his (the defendant's) "deal." Less than a month prior to the shooting, the defendant went to New Hampshire to see Bobby and to "get something resolved or taken care of." While there, the two men physically fought over the share of money the defendant received.

Christine's testimony indicates that her marriage to the defendant began to deteriorate after Bobby's death. By June of 1985, she determined that she must leave the defendant because of the shooting.

After her separation from the defendant, he began to harass and threaten Christine and her family. On one occasion, the defendant came at Christine with a gun, but she was able to defend herself. Following an incident on July 4, 1985, Christine filed for divorce. Three to four weeks after the filing, Christine began seeing the defendant twice weekly for "sexual relations." Christine testified that she was forced to make those visits because of the defendant's death threats against her family and herself. Christine also testified that on several occasions after Bobby's death, the defendant threatened her with statements to the effect that she had better not push him (the defendant) because Bobby had done so and she saw what happened to him. Christine also said the defendant told her that "rats" or "snitches" always die and that she could not testify against him because she was his wife.

Finally, after a threat by the defendant against her father's life, Christine Wilson sought out FBI agent Tom Murphy, to whom she told her story. Eventually she talked with the Omaha police. After making her own taped statement, Christine was asked to have a recording device placed in her purse to record conversations between herself and the defendant.

Christine agreed to carry such a device on December 17, 1985, but the defendant was unusually quiet that day and, according to Christine, hardly talked at all. She agreed to return to the defendant's home on January 2, 1986, with another listening device in her purse. On this occasion the conversation was monitored and recorded by an Omaha police officer in a nearby unmarked car. Four cassette tapes were used to record the conversation. In this conversation the defendant alluded to

Bobby's death as Christine said that he frequently had. The defendant was arrested 1 week later on January 9, 1986, and subsequently charged with first degree murder and the use of a firearm to commit a felony.

Trial to a jury began July 8, 1986. At trial, defense counsel objected unsuccessfully to the testimony of Christine Wilson and Joseph Lang, Sr., regarding their knowledge of the Florida robbery, on grounds of relevance and that it related to other crimes, wrongs, or acts.

Defense counsel also objected unsuccessfully to the admission of two portions of exhibits 1 through 4, the tape-recorded conversations between Christine Wilson and the defendant on January 2, 1986. This objection was that the two portions in question related to other crimes, wrongs, or acts and were therefore inadmissible.

Additionally, exhibit 37, photocopies of nine records of complaints received by the Bellevue, Nebraska, police department are said to have been received over the objection of defense counsel. These records indicate complaints were received from Christine Wilson's parents' home between July 4 and 8, 1985. The record of each complaint includes a remarks section which reflects the statements which were made by the complaining party when the call was made.

As to the first assignment of error, the defendant concedes that the testimony regarding the Florida robbery was relevant under Neb. Rev. Stat. § 27-404(2) (Reissue 1985), to show the motive to commit the crimes alleged. Clearly, that was the State's purpose in offering the testimony.

Section 27-404(2) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Nevertheless, the defendant contends that Neb. Rev. Stat. § 27-403 (Reissue 1985) required exclusion of the testimony because its probative value was outweighed by the danger of unfair prejudice. Specifically, the defendant claims that the

evidence was unfairly prejudicial because it showed the defendant was involved in drugs and a robbery.

Section 27-404(2) is subject to the overriding protections of § 27-403. *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987). The latter section provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the *danger of unfair prejudice*, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis supplied.) § 27-403.

It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Clancy, supra.*

As noted in *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984), most evidence offered by one party to an action is intended to be prejudicial to the opposing party; it is only unfair prejudice with which § 27-403 is concerned. According to *Lincoln Grain, supra* at 439, 345 N.W.2d at 306, "In the context of § 27-403 such prejudice means a tendency to suggest a decision on an improper basis."

Probative value, on the other hand, "is a relative concept and involves a measurement of the degree to which the evidence persuades the trier of fact that a particular fact exists and the distance of that particular fact from the ultimate issue in the case." *State v. Clancy, supra* at 498, 398 N.W.2d at 715.

The ultimate issue in this case was the defendant's guilt or innocence of the crimes charged. Proof of motive was critical to the State's case under the circumstances of the shooting. Christine Wilson and the defendant had both originally reported that Bobby's gunshot wound was self-inflicted. There was evidence presented by the defendant to the effect that Bobby and the defendant were close to each other and were thought to have a good relationship prior to the shooting. A neighbor testified that Bobby was the black sheep of the family, who the defendant was always trying to help. There was also testimony, by Bobby's widow on cross-examination, that the defendant was a "soft touch" with money for his grandchildren as well as for Bobby.

Motive is defined as that "which leads or tempts the mind to

indulge in a criminal act." *State v. Coca*, 216 Neb. 76, 82, 341 N.W.2d 606, 610 (1983). Absent evidence of the circumstances leading to the dispute between the victim and the defendant regarding the money obtained in the Florida robbery, there would have been no apparent motive for the defendant to have shot his son.

Further, the testimony relating to the Florida robbery tended to suggest that it was the victim who actually committed the robbery, and not the defendant. In fact, the defendant had departed from Florida at the time of the alleged robbery and mentioned no plans to Lang about returning. Thus, the evidence suggested limited involvement by the defendant and did not warrant a conclusion by the trial court that the jury would improperly base its decision on that involvement in reaching its verdict. The trial court did not abuse its discretion in receiving the testimony. The probative value of the testimony outweighed the danger of unfair prejudice.

Next, the defendant complains that two portions of exhibits 1 through 4, the tape recordings of the January 2, 1986, conversation between the defendant and Christine Wilson, should have been excluded under § 27-404(2).

The prosecution originally offered exhibit 5, a copy of portions of the original tape recording of the January 2 conversation, during the direct examination of Christine Wilson. The exhibit was received into evidence without objection.

On cross-examination, defense counsel questioned Christine Wilson about why she had failed to immediately report that the defendant was responsible for the shooting. The questions suggested that Christine had the opportunity to immediately report the crime without fear of harm from the defendant. Throughout this line of questioning, Christine maintained that she did not immediately come forward because she feared the defendant would kill her. She also indicated that she had thought incarceration of the defendant would provide no protection because she believed he had "big connections" all over the country.

During further cross-examination, defense counsel offered exhibits 34 and 35, which are copies of the entire January 2

conversation with the exception of two deleted portions, which portions were among those deleted in exhibit 5.

The first deleted portion involved the defendant mentioning that he had been contacted to come to Casper, Wyoming, to talk to "Kirkland." During the discussion, Christine asked the defendant, "What's he want you to do, bump those guys off or somethin'?" The defendant responded that he did not know.

In the second deleted portion, the defendant indicated that he had been contacted by someone named Charlie to "torch" the Capitol Bar. The defendant also indicated that he refused to do it because he had not been offered any money.

The State objected to the offer of exhibits 34 and 35 on grounds that the two portions should not be deleted because they were part of the entire conversation and were relevant to show Christine Wilson's basis for fearing the defendant.

The court ultimately determined that the tapes (exhibits 1 through 4) were admissible in their entirety. The State was granted leave to reopen direct examination of Christine Wilson, and upon doing so, offered exhibits 1 through 4 over defense counsel's objections that the two portions in question were inadmissible pursuant to § 27-404(2).

Section 27-404(2) is an inclusionary rule which permits "the use of relevant other crimes, wrongs, or acts . . . if such is relevant for *any* purpose other than to show defendant's propensity or disposition to commit the crime charged." (Emphasis supplied.) *State v. Kern*, 224 Neb. 177, 185, 397 N.W.2d 23, 29 (1986).

In *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981), this court concluded that evidence of other assaults on the victim and his brother were admissible under § 27-404(2) in a prosecution for first degree sexual assault. Specifically, the court concluded the evidence was admissible because it was offered to corroborate testimony that the boys feared the defendant and because it also explained their failure to make a prompt complaint.

The evidence in the present case was relevant for purposes similar to those in *Hitt, supra*. Clearly, a material issue in this case related to why Christine Wilson failed to promptly report that the defendant was responsible for the shooting. According

to her testimony, she did not come forward at an earlier time because she feared retaliation by the defendant or others with whom he had connections. Thus, exhibits 1 through 4 were relevant to corroborate Christine Wilson's testimony concerning her fear of coming forward with the truth about the shooting.

Further, the trial court did not abuse its discretion in admitting this evidence because of the danger of unfair prejudice. The evidence in question involved talk by the defendant of being asked to commit or become involved in certain unlawful activities. While the conversations suggested that he had connections with persons who might ask him to commit criminal acts, it did not show that the defendant agreed to participate in them. On the other hand, the evidence did suggest that the defendant had connections with persons involved in criminal activity, as claimed by Christine Wilson. As previously stated, this evidence supported the testimony of Christine Wilson regarding her hesitation to come forward.

Finally, the defendant maintains the trial court committed reversible error in receiving exhibit 37 into evidence. Exhibit 37 consists of three photocopied pages reflecting nine complaint reports recorded by the Bellevue Police Department between July 4 and 8, 1985. Information in these reports includes the address, date, and time of the complaint; the police unit dispatched; a code reflecting how the complaint was made; a code indicating the type of call; a number representing the person receiving the call; the district of the call; a disposition code; a case number; the name, address, and telephone number of the complaining party; and a remarks section reflecting statements made by the complaining party.

The record does not show that exhibit 37 was actually received in evidence, although it is included in a volume of exhibits in the bill of exceptions. Instead, some of the information appearing in the reports was elicited through the testimony of Gary Fliehmann, the chief of communications of the Bellevue Police Department and the person ultimately in control of the filing of the complaint reports. Fliehmann specifically testified to the dates and times of the complaints and that they all involved 1114 Grandview. Defense counsel

indicated that he had no objection to the receipt of this information. He did object on hearsay grounds to questions regarding who lived at 1114 Grandview and who made the complaints. These objections were overruled. On previous cross-examination, Christine Wilson testified that her parents lived at the address in question.

The defendant maintains that exhibit 37 amounts to hearsay within hearsay and should have been excluded because there was no showing that each level of hearsay was admissible under an exception to the rule. There is no merit to this argument, even assuming that exhibit 37 was received into evidence.

Neb. Rev. Stat. § 27-802 (Reissue 1985) provides that "[h]earsay is not admissible except as provided by these rules or by other rules adopted by the statutes of the State of Nebraska." Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801(3) (Reissue 1985). Included within the definition of a statement for hearsay purposes are oral or written assertions. § 27-801(1)(a).

Neb. Rev. Stat. § 27-805 (Reissue 1985) provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule proved in these rules."

The defendant contends that exhibit 37 includes both oral and written assertions which amount to hearsay. Specifically, he argues that the written assertions are the written records themselves and the oral statements are the statements contained on the records, i.e., information provided by the complaining parties.

Although the record fails to show that exhibit 37 was received, the State did offer it into evidence at one point. The defendant objected on hearsay grounds, to which the State responded that the exhibit was not being offered to prove the truth of any message received. Instead, the State maintained it was offered merely to show complaints were received. The State's position was supported by testimony from Gary Fliehmann on direct examination:

Q. The truthfulness or the untruthfulness of the

complaint of the party that is recorded on those cards, you have no way of knowing?

A. No. We just take the information that they give us.

Q. And their complaint?

A. That's right.

Christine Wilson's credibility was critical to the State's case. In her testimony previous to the offer of exhibit 37, she testified that she and her family were harassed by the defendant on the 4th of July, 1985, and that the harassment escalated after that date. These events ultimately led her to contact law enforcement officials about the defendant's involvement in the shooting because she feared he might kill someone else. She also testified that because of the harassment "we had the police, Bellevue Police Department, over 20 times a day." At the time of the complaints, Christine Wilson was living with her parents.

The oral assertions complained of in exhibit 37, i.e., the remarks noted in the remarks section and the parties' names, were not offered to prove the truth of any matter therein asserted. As such, they were not hearsay statements. Instead, they were offered to show that complaints were received from persons claiming disturbances at 1114 Grandview during time periods relevant to this case. The evidence tended to corroborate Christine Wilson's testimony that complaints were made regarding the defendant during the relevant time period.

Any argument as to the admissibility of Gary Fliehmann's testimony regarding the times, dates, or addresses of the complaints, or as to the names given by the complaining parties, is similarly resolved. That evidence was also offered to show that complaints were received and not to prove the truth of the information received.

The "written assertions" or written records themselves were admissible under the business records exception to the hearsay rule. Neb. Rev. Stat. § 27-803(5) (Reissue 1985). The foundational requirements for admitting a document under this section are: "First, the activity recorded must be a type which regularly occurs in the course of the business' day-to-day activity. Second, the record must have been made . . . at or near the time of the event recorded. Third, the record must be authenticated by a custodian or other qualified witness."

*Crowder v. Aurora Co-op Elev. Co.*, 223 Neb. 704, 715, 393 N.W.2d 250, 258 (1986) (quoting *Chalupa v. Hartford Fire Ins. Co.*, 217 Neb. 662, 350 N.W.2d 541 (1984)).

Since these foundational requirements were satisfied by Gary Fliehmann's testimony, the trial court would not have committed an abuse of discretion in admitting exhibit 37.

There being no error, the judgment is affirmed.

AFFIRMED.