STATE OF NEBRASKA, APPELLEE, V. ROGER BRUCE RINCKER, APPELLANT.

423 N.W.2d 434

Filed May 13, 1988.    No. 87-162.

Robert P. Chaloupka of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, P.C., for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Defendant-appellant, Roger Bruce Rincker, was charged with murder in the first degree, a violation of Neb. Rev. Stat. § 28-303 (Reissue 1985), and with the use of a deadly weapon to commit a felony, a violation of Neb. Rev. Stat. § 28-1205 (Reissue 1985). A jury found him guilty of manslaughter, a violation of Neb. Rev. Stat. § 28-305 (Reissue 1985), and of using a deadly weapon to commit a felony. He was so adjudged and sentenced to imprisonment for 7 years on the manslaughter conviction and to a consecutive term of 3 to 5 years on the use of

a deadly weapon conviction. Rincker assigns as error the district court's (1) rejection of certain psychiatric evidence, (2) receipt of testimony concerning certain of his prior conduct, (3) refusal to permit cross-examination to show a crucial State's witness was on probation at the time of the killing, (4) instruction to the jury concerning deadly force, (5) instruction to the jury concerning intent, (6) instruction to the jury concerning manslaughter, and (7) imposition of the aforesaid sentences as excessive. The record fails to support any of the assigned errors; thus, we affirm.

## BACKGROUND FACTS

At the time of the trial Rincker was living near Hay Springs, Nebraska, where he and his father had been partners in a farming operation since 1975.

In 1980 Rincker married his first and only wife, Vickie. By 1983 the couple had produced two daughters, one of whom was 5 years old and the other 4 years old at the time of trial. Rincker testified that his marriage proceeded normally until 1983, after the birth of their second daughter, at which time his wife began to drink excessively. In April of 1984 she was arrested for driving while intoxicated, and as the result of a later speeding violation was ordered to undergo 30 days of alcohol treatment. She commenced that treatment in South Dakota in December of 1984.

Before his wife commenced treatment, Rincker, in September 1984, filed for dissolution of his marriage. At some point, it is not entirely clear when, Rincker's wife moved out of the family home and lived alone in town; the couple's daughters remained with Rincker. Although Rincker had filed the dissolution action, he nonetheless joined an emotional support group for members of an alcoholic's family and continued to financially maintain his wife.

During the time his wife lived out of the family home, she engaged in a sexual relationship with the victim, Bryant Ferrel. She also had a sexual encounter with Larry Siegrist, a friend and part-time roommate of Ferrel's. In November 1984 his wife informed Rincker of her prior relationships with these two men. Rincker thought the relationship between his wife and the victim had ended before she left for treatment in December

1984, but later learned she had resumed the association.

In December 1984, shortly after his wife had entered treatment, Rincker went to check her residence in town. The house was empty, but Rincker saw a beer keg in the sink which he later spotted beside a shop belonging to the victim, notwithstanding the fact that Rincker had locked his wife's house when he left. Rincker then sought the "aid" of a friend, John Wright, to find the victim and talk with him. Rincker and Wright found the victim at a Hay Springs bar, where Rincker questioned the victim about the keg. After this incident, Rincker heard that the victim stated to another that he, the victim, wished he would have "kicked [Rincker's] butt" at the bar.

Shortly thereafter, Rincker saw the victim in a bar at Chadron and told the victim that Rincker's wife was in treatment for alcoholism and that Rincker wanted his wife to come home to her children. The victim replied that he did not want her anyway.

Over objection, one Vickie Deans, a former bartender at a Hay Springs bar, testified that sometime in February 1985, Rincker came "slamming through the door, [looking] upset," went over to the victim, and said that "if he ever caught him [the victim] with his wife again, he [Rincker] would kill him." Rincker denied ever threatening the victim.

There was testimony that the victim, a 27-year-old wrestler and bull rider, had a propensity for fighting or brawling. Various witnesses testified to the victim's reputation as one who liked to fight and as one who would not back down from a fight. He was 5 feet 10 inches tall and weighed approximately 180 pounds.

On the other hand, witnesses testified that Rincker, who was 34 years old, stood 5 feet 6 inches tall, and weighed approximately 140 pounds, had a peaceable and trustworthy reputation. There was also testimony that when he was younger, Rincker had been involved in 4-H, church, and school activities, and had become an Eagle Scout, earning a "God and Our Country" award. He graduated from the University of Nebraska in 1974 with a degree in animal science before choosing to return to start the farming operation with his

father. At the time of trial, Rincker was an active member of his church and served as a member of the church council. He was also a member of the Junior Chamber of Commerce and active in a Boy Scout group. The evidence also established that Rincker was a devoted father and husband.

Rincker's wife moved back into the family home in April 1985, and Rincker dismissed the dissolution action. Rincker testified that during the period following his wife's return home, the victim began "aggravating" the couple, and that at a dance in August of 1985, the victim challenged Rincker by asking whether Rincker wanted to do something about the victim's sexual relationship with Rincker's wife.

Rincker's wife began drinking again and was back in alcohol treatment by November 1985.

## THE KILLING

On July 16, 1986, Rincker's wife returned from visiting her sister in Rapid City, South Dakota. Rincker had spent the day of July 17, 1986, irrigating the fields. When Rincker got home at 7 that night, his wife met him at the door and said she was going to town for cigarettes. Rincker took the children to the fields with him, then returned to put them in bed around 10:15 p.m. His wife had not yet returned, so Rincker also went to bed.

At 2:30 the next morning, he woke up and realized that his wife was not yet home. Becoming worried about her, he left the children sleeping and went to town to find her. He drove by several of her friends' houses but did not spot her car until he reached Siegrist's house, where he found his wife's parked car, along with Siegrist's and the victim's trucks.

Rincker wanted to find his wife and bring her home, and also felt he "just had to know" what she was doing with the two men. Being worried about not being able to get out of Siegrist's house alive, and thinking he could "back off" the victim, Rincker took a hunting knife from his truck and clipped it to the back of his belt. He did not take a gun which he carried in his truck. As he walked up to Siegrist's house, he could hear his wife's voice and could tell that she was drunk. Rincker then entered the darkened house and headed for the only room from which there was light. As he entered the room, he saw his wife, who was clothed, sitting on the bed between Siegrist and the

victim. Both men were naked.

The testimony as to what happened next is in conflict. Rincker testified that the victim rushed for him and that he stabbed the victim in self-defense. Siegrist testified, however, that Rincker rushed toward the victim first. As Rincker's wife had fled the house before the stabbing, Rincker went looking for her. The victim died 2 hours later of a stab wound to the chest, which caused him to bleed to death.

## PSYCHIATRIC TESTIMONY

Prior to trial, Rincker was examined by two psychiatrists concerning, among other things, his state of mind at the time of the stabbing. The depositions of both of these psychiatrists were then taken. The State later filed a motion in limine, asking that Rincker be precluded from using the psychiatric testimony on the ground, inter alia, that the psychiatrists would not be testifying that Rincker was suffering from any mental condition which had legal significance.

The trial judge ruled in essence that the psychiatrists would be allowed to state their qualifications, then give an opinion as to whether Rincker, on July 18, 1986, suffered "from intoxication or subnormal mentality or a mental disease existing to such a high degree as to overwhelm reason, judgment and conscience so that he was unable to understand the nature and quality of his act and to distinguish right from wrong." If the answer to this question were in the negative, further testimony would be precluded.

Rincker then offered to prove that one psychiatrist would testify that at the time of the stabbing, Rincker was suffering from an anxiety-ridden neurosis which caused him to panic, and that in that psychiatrist's opinion Rincker acted out of self-defense. Rincker asserts that the failure to admit the foregoing testimony was error, as it bore on his lack of intent to commit the crime.

*State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984), is illustrative of this issue. The defendant therein went to the hospital at which his wife was confined, with the intention to commit suicide by shooting himself in her presence. Instead, he shot her paramour after encountering the two embracing. The defense introduced psychiatric testimony as to the defendant's

ability to form the intent to commit the murder, claiming that the shooting was not the result of a prior plan but, rather, was done in response to an "irresistible impulse" provoked by seeing his wife and her paramour together. The defendant argued that the insanity defense instruction should not have been given because the evidence introduced was "directed only toward showing that when he shot his wife's paramour, the act was not done with premeditated malice as required by the crime with which he was charged." *Id.* at 466, 345 N.W.2d at 810. The court agreed that as defendant had not raised insanity as a defense, the jury should not have been instructed as to the elements of such defense. In the course of so deciding, the court also observed, however:

> While evidence of an accused's mental condition at the time the offense was committed is always admissible to prove absence of intent, our law does not recognize as a defense the concept of "irresistible impulse." Therefore, any opinion of a mental health expert based on the theory of "irresistible impulse" is irrelevant and therefore inadmissible for any purpose. [Citations omitted.]

*Id.* at 468, 345 N.W.2d at 811.

Under the state of the record, we need not, and therefore do not, decide whether the trial judge's ruling would have been correct had the offer of proof established that in the psychiatrist's opinion Rincker's state of mind was such that he could not have formed an intent to kill the victim. In truth and fact, the evidence at issue amounted to nothing more than a statement by the psychiatrist that, considering all the circumstances, he believed Rincker's claim that he acted out of fear for his own safety. As observed in *State v. Matthews*, 301 Minn. 133, 221 N.W.2d 563 (1974), the jury was capable of evaluating the circumstances surrounding the killing and of deciding for itself, without expert advice, whether Rincker reasonably feared for his life when he killed the victim and thus acted in self-defense.

## OTHER CONDUCT

Next, Rincker assigns as error the trial court's admission into evidence of Deans' testimony as to the February 1985 incident described earlier, in the BACKGROUND FACTS section of

this opinion. He argues the testimony should have been excluded both because the event was too remote in time to be relevant and because Deans had told the police and had sworn during a deposition only that Rincker threatened to "do something drastic," rather than to "kill" the victim, as she testified at trial.

Neb. Rev. Stat. § 27-404(2) (Reissue 1985) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is well established that the foregoing statute is an inclusionary rule permitting the use of relevant evidence of other crimes, wrongs, or acts for purposes other than to prove the character of a person in order to show that such person acted in conformity with that character. Thus, § 27-404(2) permits evidence of other crimes, wrongs, or acts if such is relevant for a purpose other than to show defendant's propensity or disposition to commit the crime charged. *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986). In applying § 27-404(2) we have said that evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question. *State v. Kern, supra.*

Unlike the situation recently presented in *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988), where the evidence of other wrongs concerned events which bore no relationship to the crimes charged, the evidence in question in the present case tends to show Rincker was involved in a long-running dispute with the victim and thus bears on the question of intent, which, because Rincker was charged with first degree murder, was an issue. Therefore, the questioned evidence was relevant.

As to the matter of remoteness, this court noted in *State v. Kern, supra* at 185-86, 397 N.W.2d at 29, that

the admissibility of evidence concerning other conduct

must be determined upon the facts of each case and that no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is remote. The question of remoteness in time is largely in the sound discretion of the trial court; while remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence.

As noted on numerous other occasions, the admission or exclusion of evidence is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Ryan*, 226 Neb. 59, 409 N.W.2d 579 (1987); *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766 (1987). In view of Rincker's position that he armed himself with a knife only because he feared for his life when he entered Siegrist's house, we cannot say the trial court abused its discretion in determining that Deans' testimony was not so remote in time as to be inadmissible.

Rincker's reliance upon *State v. Harrison*, 221 Neb. 521, 378 N.W.2d 199 (1985), and *People v. Lampkin*, 98 Ill. 2d 418, 457 N.E.2d 50 (1983), in arguing otherwise is misplaced. The defendant in *Harrison* was seeking to show his state of mind at the time of the murder by introducing, as an exception to the hearsay rule under the provisions of Neb. Rev. Stat. § 27-803(2) (Reissue 1985), the testimony of a gunshop owner as to the reason defendant had given for buying a gun some 6 to 8 weeks before killing his wife. The trial court properly excluded the testimony because defendant's state of mind when he bought the gun was not a material fact. In *Lampkin*, not only was the threat 6 years old, it was of a general nature and not directed at a particular person; thus, it had no probative value to show defendant's malice against the murder victim.

As to the change in reporting what Rincker said, Deans explained that she had softened Rincker's statement when talking to the police and giving deposition testimony, but later felt guilty about misrepresenting the truth. The matter was for the jury to consider in assessing Deans' credibility, and provided no basis for excluding her testimony.

## PROBATIONARY STATUS OF WITNESS

In his third assignment of error Rincker contends the trial court erred in refusing to permit him to show by cross-examination that Siegrist, an eyewitness to the killing and thus a crucial State's witness, was, at the time of the killing, on probation as the result of a drunk driving conviction.

*Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), held the trial court committed prejudicial error when it refused to permit the defendant therein to cross-examine a crucial prosecution witness to establish that the witness was on juvenile probation at the time of the crimes and of trial. The *Davis* Court ruled that the defendant's right of confrontation under U.S. Const. amends. VI and XIV was paramount to the state's policy of protecting the anonymity of juvenile offenders and that the defendant had the right to show the witness was biased by virtue of his vulnerable status as a probationer and his concern that, because the stolen safe was found on his property, he himself might be a suspect in the burglary charged against the defendant. In so ruling, the *Davis* Court stated: "We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." 415 U.S. at 316-17.

In the case before us, however, not only was Siegrist not himself a suspect, he was not on probation at the time of trial. The very county judge who had placed Siegrist on probation conducted the preliminary hearing which produced the trial resulting in the appeal presently before us. During the course of that preliminary hearing, Siegrist admitted that he had drunk a beer at a bar during the evening preceding the killing. As a consequence, the county judge determined Siegrist had violated a condition of his probation by drinking. That county judge therefore "unsatisfactorily discharged" Siegrist from his probation. As a consequence, Siegrist served 7 days in jail; that jail time would have been suspended had he satisfactorily completed probation. Thus, by the time of trial Siegrist was no longer vulnerable to the State's reprisal because of an earlier probationary status; he had been punished, and the effects of his violation of probation had become final and could not be

enhanced by State action. Indeed, during cross-examination at trial, Siegrist admitted he had also been at another bar the night preceding the killing where he drank "a couple of beers," and further admitted he had omitted relating that fact in his deposition because he had not remembered.

Under those circumstances, we cannot say the trial court abused its discretion in such a manner as to have deprived Rincker of his right to confront Siegrist. See *Amin v. State*, 686 P.2d 593 (Wyo. 1984), which rules that where a prosecution witness was not on probation at the time of the crime or trial, was not an accomplice or suspect, and, although he was the victim, he was not the State's only witness, it was not error to refuse cross-examination to show that the witness had been on juvenile probation.

## DEADLY FORCE INSTRUCTION

Rincker requested an instruction which asked the jury to consider in its deliberations the matter of justification or self-defense, and which defined deadly force as in Neb. Rev. Stat. § 28-1406(3) (Reissue 1985):

> Deadly force shall mean force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, shall not constitute deadly force.

In this fourth assignment of error Rincker complains that the instruction given to the jury defined deadly force only by using the first sentence of the foregoing definition. Rincker calls our attention to *State v. Bridger*, 223 Neb. 250, 388 N.W.2d 831 (1986), which held that the refusal to give a requested instruction which defined a word in an essential element of the crime charged was prejudicial error. However, *Bridger* is inapposite for the obvious reason that self-defense is not an essential element of homicide in any degree. Just as obviously, the second sentence of the definition tendered could have no

application because there was no evidence that anyone fired in the direction of another person or at a vehicle. Neither could the third and last sentence of the definition tendered have application, because Rincker did something more than merely threaten to use the knife to cause death or serious bodily harm; he actually used the knife. While the trial court did not use all of the tendered definition of deadly force, it did properly instruct the jury as to when and under what circumstances deadly force is justifiable, including the fact that Rincker could use such force as he "reasonably believed to be immediately necessary, although he may have been in error as to the actual danger, if a reasonable person could also have been so in error." The total instructions given the jury correctly state the law in this regard. As noted in *State v. Copple*, 224 Neb. 672, 699, 401 N.W.2d 141, 159 (1987), quoting *State v. Dondlinger*, 222 Neb. 741, 386 N.W.2d 866 (1986):

> "Prejudicial error regarding jury instructions may not be predicated solely upon a particular sentence or phrase in an isolated instruction, but must appear from consideration of the entire instruction of which the questioned sentence or phrase is a part, as well as consideration of other relevant instructions given to the jury. . . . ' " 'All the instructions must be read together and if the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error.' " ' "

See, also, *State v. Medina*, 227 Neb. 736, 419 N.W.2d 864 (1988); *State v. Ryan*, 226 Neb. 59, 409 N.W.2d 579 (1987); *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766 (1987).

## INTENT INSTRUCTION

In the next assignment of error Rincker complains that in its intent instruction to the jury, the trial court omitted the sentence contained in Rincker's requested instruction that "[t]he intent required by [another instruction] is a material element of the crime charged against the defendant." What Rincker's argument overlooks is that another of the trial court's instructions to the jury included as an element of murder in the first or second degree that the killing be done "intentionally." The legal analysis which established the previous assignment of

error to be without merit serves to establish this fifth assignment to be equally meritless.

## MANSLAUGHTER INSTRUCTION

Rincker next asserts that as he did not ask for a manslaughter instruction, the trial court erred in instructing the jury concerning that offense. This argument completely ignores the existence of Neb. Rev. Stat. § 29-2027 (Reissue 1985), which provides: "In all trials for murder the jury before whom such trial is had, if they [sic] find the prisoner guilty thereof, shall ascertain in their [sic] verdict whether it be murder in the first or second degree, or manslaughter . . . ." The problem was considered at some length in *State v. Archbold*, 217 Neb. 345, 350, 350 N.W.2d 500, 504 (1984), as follows:

> Notwithstanding an information charging murder, when evidence can support different and reasonable inferences regarding the degree or grade of criminal homicide, the jury must draw the inference determining the degree of criminal homicide. [Citations omitted.]
>
> In order that there be an instruction on manslaughter as a lesser degree of criminal homicide within the charge of murder, there must be evidence which tends to show that the crime was manslaughter rather than murder. [Citation omitted.]
>
> When a proper, factual basis is present, a court must instruct a jury on the degrees of criminal homicide, that is, the provisions of § 29-2027 are mandatory. [Citation omitted.] Where murder is charged, the court is required, even without request, to instruct the jury on the lesser degrees of criminal homicide for which there is proper evidence before the jury. [Citation omitted.]

The jury could well have concluded from the evidence that Rincker's wife was lying on the bed between the victim and Siegrist and that Rincker reacted to that scene without any prior intention to kill the victim. That alone required the trial court to instruct the jury concerning manslaughter. See, also, *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984); *State v. Drew*, 216 Neb. 685, 344 N.W.2d 923 (1984).

## THE SENTENCES

Rincker claims in his seventh and final assignment of error

that his sentences are excessive.

While it is true that Rincker has no prior criminal record and has a history of good and responsible conduct, the fact remains that he, albeit unintentionally, took a life. In imposing its sentences the trial court listed, among other considerations, the fact it was not convinced Rincker fully understood the seriousness of what he had done and that any sentences imposed must be such as not to depreciate the seriousness of the crimes involved. See Neb. Rev. Stat. § 29-2260 (Cum. Supp. 1986).

Manslaughter is a Class III felony, § 28-305, as is the use of a deadly weapon, § 28-1205, making each offense punishable by imprisonment for a minimum of 1 year and a maximum of 20 years, or a $25,000 fine, or both such imprisonment and fine. Neb. Rev. Stat. § 28-105 (Reissue 1985). By imposing a prison sentence for a fixed period of 7 years for the manslaughter conviction, the trial court in effect sentenced Rincker to imprisonment on that conviction for an indeterminate period of from 1 to 7 years, less certain good time computations. Neb. Rev. Stat. §§ 83-1,105, 83-1,107, 83-1,107.01, and 83-1,108 (Reissue 1987); *State v. Spotted Elk,* 227 Neb. 869, 420 N.W.2d 707 (1988); *State v. Ryan,* 222 Neb. 875, 387 N.W.2d 705 (1986). Thus, as Rincker observes, the minimum sentence for the weapons conviction is three times greater than the minimum sentence applicable to the killing. Contrary to Rincker's contention, however, this fact does not establish an abuse of discretion. The manslaughter was an unintentional act; bringing the knife to the scene was an intentional act. Without the knife the killing would likely not have occurred. The evidence is that Rincker's entry into Siegrist's house was motivated at least as much by his desire to see what his wife was doing as it was by a wish to bring her home. Neither is there any suggestion that Rincker feared for his wife's life. Under the circumstances, Rincker need not have entered the house but could instead have resolved his fear of entering the Siegrist house by seeking other means to attempt to persuade his wife to return home.

The oft-repeated rule is that a sentence within statutory limits will not be set aside absent an abuse of discretion. *State v.*

*Moreno, ante* p. 210, 422 N.W.2d 56 (1988); *State v. Lane,* 227 Neb. 687, 419 N.W.2d 666 (1988).

AFFIRMED.