STATE OF NEBRASKA, APPELLEE, V. JAMES A. WELLS, APPELLANT.
425 N.W.2d 338

Filed July 1, 1988.   No. 87-674.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Robert M. Spire, Attorney General, and Steven J. Moeller for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

A jury found defendant, James A. Wells, guilty of first degree sexual assault, a violation of Neb. Rev. Stat.

90

§ 28-319(1)(a) (Reissue 1985); he was so adjudged and thereafter sentenced. In this appeal he asserts the district court erred in (1) receiving certain evidence and (2) permitting the prosecutor to inquire into and comment upon his silence during the investigation of the crime. We reverse and remand for a new trial.

## FACTS

On June 5, 1986, following separation from her husband, the victim, R.L., and her 14-year-old daughter took up residence in a downtown Omaha apartment building. R.L.'s was a second-floor apartment overlooking the roof of an adjoining one-story portion of the structure, this roof being about 18 inches below the level of the living room window to her apartment. Elevators in the building cannot be activated without a security code, and the stairwells above the lobby level are locked from the direction of entry.

On the second night of her residence at the apartment building, the victim was awakened by the phone at 1 o'clock in the morning. Once awake, she noticed that her daughter was not in the apartment. Moments later, a man tried to enter her apartment through the open living room window; he was apparently startled to find R.L. awake, asked for her daughter, and immediately exited.

R.L. began to search for her daughter, starting with the neighboring apartment of one Ron Cichowski, whom R.L. had met when she moved into the apartment building. Cichowski's apartment was also on the second floor, directly across the roof from R.L.'s living room. R.L. found her daughter in Cichowski's bathroom; the daughter was drunk and lost consciousness shortly thereafter. Also found in the bathroom with her daughter was the defendant. At this time, R.L. recognized defendant as the person who moments earlier had attempted to enter her apartment.

After taking the daughter to her apartment and putting the daughter in bed, R.L. returned to Cichowski's apartment to talk to him about her daughter's intoxication. Defendant was still in Cichowski's apartment at this time but, according to R.L., kept his back to her and left shortly after she returned. Two days later, at R.L.'s instance, the daughter was made a

ward of the state and resided in various care facilities thereafter through the time of trial.

Cecil Walker, a friend of Cichowski's, had been present in Cichowski's apartment the night and morning the victim's daughter was found in Cichowski's bathroom. Walker testified that the daughter went to Cichowski's apartment sometime after 8 or 9 p.m. and drank beer with Walker, Cichowski, and defendant, who had arrived about an hour after the daughter. Walker also testified that the defendant remained in the apartment throughout approximately $1\frac{1}{2}$ hours of the victim's discussion of the drinking incident with Cichowski, although the victim did not speak to defendant directly during this period. Walker also testified that later that morning, he found defendant on the fire escape above Cichowski's bedroom window. The victim subsequently encountered defendant for a brief period, but the two did not speak.

The day following the attempted entry into the victim's apartment, she and a friend secured the living room window with boards. However, the building manager removed the boards from the living room window on June 10, assuring R.L. that although the window lacked working locks, it was impossible for anyone to gain entry as long as the window was closed because "there were only handles on the inside . . . ."

On July 26, 1986, the victim rose a few moments after hearing a noise at approximately 2:20 a.m. and turned on the bathroom light. After she examined the living room window and noted that the outer casement window and the inner screen were both secure, she returned to bed. The victim was awakened later that morning and found that "there was a man on top of me and he didn't have any clothes on. I was sleeping on my back and when I woke up he was probably — I don't know — a few inches away from my face." The bathroom light shone dimly into the victim's bedroom; as soon as she awoke, the man ordered her to roll over on her stomach, and she complied. The victim was wearing a nightgown, underwear, and knee socks. Her underwear had been cut in two in the crotch area, apparently before she awoke. The man ordered the victim to remove her nightgown, and after she complied, he raped her.

After "five or ten minutes," the rapist withdrew, ordered the victim to remain on her stomach, and dressed. At one point the victim turned her head enough to see the man putting on blue jeans. She testified:

He saw me looking at him and he told me to get on my stomach and to keep my head down. I was asking him not to hurt me. He was pacing in my bedroom and he wasn't talking and he asked me if I had a phone. I told him that I did. He asked where it was and I told him it was in the living room, and he said, "You are going to call the police when I leave," and I told him that I wouldn't call the police; that he could take the phone with him. He said that he didn't want my phone, and he said, "You're going to call the police," and then he said, "If you do that, you're going to hurt me so I am going to have to hurt you." I told him that I wasn't going to hurt him. I was crying and I just said that I couldn't because I didn't know who he was. He stayed in the bedroom for a while walking around and then he told me to roll over on my side, which was facing the bedroom window, and when I did that, I heard him exit my bedroom door and leave through the living room window, run across the roof and I heard him jump. When he jumped, the minute he jumped I heard what I felt was a motorcycle start up. . . . It took off.

The victim immediately put her nightgown back on and went to a friend's apartment on an upper floor at the building, and police officers were summoned. Upon investigation, it was discovered that the screen in the victim's living room window had been cut from the frame on two sides.

An examination of the victim conducted at 6:55 that same morning revealed the presence of sperm cells in the fluid samples taken from her.

The victim described the rapist as white, of small to medium build, about 5 feet 6 inches tall, with shoulder-length "blondish-brown" hair. The victim also thought the rapist must be someone who knew her, because few people knew which of her windows was not secured with boards, and because she felt she had heard the rapist's voice before, although in court she was unable to positively identify defendant as her attacker.

Suspicion first focused on defendant's brother, Robert Wells, whom the victim had met briefly and whom she thought had a voice rather like the rapist's. However, 4 days after the rape, R.L. was unable to identify Robert Wells' voice as being that of the rapist. About a week after the rape, the victim considered the possibility that defendant had raped her; however, although she discussed this possibility with the investigating police officers, she at that time discounted the thought because

> even though Jim and Bob are basically the same build and have the same length of hair and the same color of hair, I felt, because of the way [defendant] had looked [at the victim on the day of a previous chance encounter], if he had raped me, I felt he would have hurt me physically.

A forensic serologist with the Nebraska State Patrol crime laboratory testified that in approximately 80 percent of cases, it is possible to determine a person's blood type by analyzing saliva, semen, or vaginal fluid. It is also possible to determine which of 10 different isomers of the enzyme phosphoglucomutase (PGM) is present in samples of blood, seminal fluid, and vaginal fluid. The serologist further testified that analysis of semen stains found on the victim's bedsheet and nightclothes indicated that the rapist had type B blood and a type of PGM known as PGM $2+2+$. The victim's blood type is O, and she has PGM 1. Analysis of a sample of defendant's blood indicated that he has type B blood and PGM $2+2+$; analysis of a sample of his saliva confirmed these findings and, in addition, indicated that defendant is a "secretor," that is, one whose blood type and PGM status can be determined by examination of body fluids other than blood, particularly semen, vaginal fluid, and saliva.

According to the serologist, secretors make up 77 percent of the white male population, type B blood is found in 11 percent of the white male population, and PGM $2+2+$ is found in 3 percent of the white male population. The likelihood of finding a white male who is a secretor with type B blood and PGM $2+2+$ is approximately 1 chance in 1,000.

Cross-examination revealed that analysis of samples taken from defendant's brother indicated that the brother, too, is a secretor with type B blood and PGM $2+2+$; the test results

were identical for the defendant and his brother. The serologist also testified that one pubic hair taken from the victim's bedsheet matched known samples of both defendant's pubic hair and that of his brother.

Spermatozoa were found in the semen stains taken from the victim's bedsheet and nightclothes. A urologist testified that he had performed a vasectomy on defendant's brother on October 12, 1983; there were no complications; and following this surgery, two separate sample analyses indicated that there were no spermatozoa in the brother's semen. The urologist's most recent analysis of a semen sample from the brother was made on January 11, 1984. Following a vasectomy, spontaneous reconnection of the vas, leading to a renewed ability to ejaculate spermatozoa, occurs in less than 1 percent of cases in which no other complications are noted; the urologist had encountered no such case in his 10 years of practice.

Following these discoveries, attention shifted to defendant. On November 5, 1986, defendant was arrested on outstanding traffic warrants and briefly held in the Omaha jail. The record does not disclose whether defendant received *Miranda* warnings at this time; Omaha Police Detective Michael Hoch testified only that on November 5, 1986, he "advis[ed] [defendant] that he was going to be placed in custody because of outstanding traffic warrants." The prosecutor, during an in camera conference, stated that "there were no Miranda Rights given that day and that is clear from the reports and from my discussions with Officer Hoch. He didn't advise him of his Miranda Rights." However, no testimony to this effect was adduced.

On November 12, 1986, Hoch met with defendant at his place of employment and requested a saliva sample, which defendant provided. While defendant was not placed under arrest at this time, he was arrested again on December 17, 1986, and charged with the crime giving rise to this appeal.

At trial, the prosecutor, over defendant's strenuous objections, engaged Hoch in the following dialogue: "Q Officer Hoch, on November 5, 1986, did you attempt to talk to [defendant] concerning the sexual assault of [R.L.]? . . . [Hoch] Yes."

Upon cross-examination, defendant's attorney adduced the following testimony from Hoch regarding defendant's November 5, 1986, arrest on outstanding traffic warrants:

Q And when [defendant] was down at Central [police headquarters] did you question him regarding any . . . matters [other than the outstanding traffic warrants on which he originally had been arrested]?

[Hoch] No.

Q Did you on that day request from [defendant] any substances from his body?

[Hoch] Yes.

Q Did he volunteer these things to you?

[Hoch] Yes.

Q Did he have to do that?

[Hoch] No.

Q Was he cooperative in giving these things? Was there any big hassle to get these things from him?

[Hoch] No.

Q I think you got some blood and hair from him that day, is that correct?

[Hoch] Yes.

And further, regarding the saliva sample taken on November 12, 1986: "Q Again, did he have to give you that? [Hoch] No. Q He voluntarily and cooperatively gave it to you? [Hoch] Yes."

Following close of the State's case, defendant moved for dismissal of the charge, arguing that the State had failed to establish a prima facie case. The district court overruled the motion. Defendant then took the stand and testified that he spent the evening of July 25, 1986, in the company of a friend and coworker named Marlin, returning to his brother's house in Carter Lake, Iowa, around 2:30 on the morning of July 26, 1986, whereupon he went to bed and slept until 10 or 11 that morning. Defendant also testified that he had never had a vasectomy and was, as far as he knew, fertile as of the time of trial; that he had been the person R.L. had seen crawl through her living room window on June 6, 1986; and that he had been the person Walker had seen later that morning on the fire escape outside Cichowski's apartment.

Upon cross-examination, the State's attorney adduced the

following testimony from defendant, once again over defendant's strenuous objection:

Q And did Officer Hoch attempt to talk to you on November 5, 1986, about the rape of [R.L.] when you were taken in on the traffic warrants?

. . . .

[Defendant] Yeah.

Q . . . And did you talk to him on November 5, 1986, about the rape of [R.L.]?

[Defendant] No.

Defendant again moved for a dismissal at the close of all the evidence; the motion was again overruled. In his closing argument to the jury, the prosecutor stated:

And finally, in credibility the Judge says you can look at someone's prior conduct to see if it is consistent with their testimony at trial. . . . [O]n November the 5th you were told by Officer Hoch and from this defendant, too, that Officer Hoch tried to interview him and the defendant told you on November 5th that there wasn't any interview; that he did not talk to Officer Hoch about the incident, and that prior conduct you can take and access as to his credibility on the stand when he looked at you and said, "I didn't rape her."

. . . .

. . . He says Robert is a fleeing, fleeing rapist. Robert consented to search on August 1st and Hoch was there and talked to him, gave him an interview on July 31st, he gave him blood one day and gave him hair the next and we don't know why he left, ladies and gentlemen. There is a warrant out for child abandonment but that has nothing to do with this case. Presumably he might know why he left but he didn't tell us. [R.L.] said he had a dope problem. I don't know why he left but I do know that he did a little bit more in terms of cooperation than that guy did (indicating toward the defendant) because when Mr. Wells was asked by Officer Hoch on November 5th, it was away too late, it should have been done earlier, to talk about it. There wasn't any talk about it.

No instructions were given by the trial court limiting the

jury's use of the evidence regarding defendant's refusal to discuss R.L.'s rape with Hoch.

## EVIDENCE CONCERNING DAUGHTER

Defendant first assigns the receipt of evidence, over his objection, regarding the victim's 14-year-old daughter. In this connection defendant argues, inter alia:

> We respectfully submit to this Court that the evidence regarding the Defendant finding [the daughter] in the bathroom of Ron Cichowski's apartment, the evidence of [R.L.] returning to Cichowski's apartment after putting [the daughter] to bed, and the evidence regarding [the daughter] being made a ward of the State and being placed in Richard Young Hospital and Boys Town, all entered over Defendant's objections on relevancy grounds, do not tend to make the existence of any fact that is of consequence to the determination of the action more probable as is required by Neb.Rev.Stat. §27-401 (Reissue 1985). Thus, being not relevant it is "not admissible". Neb. Rev. Stat. §27-402 (Reissue 1985).

Brief for Appellant at 17. Initially, we note that defendant's characterization of the evidence is not accurate; nothing in the record before this court suggests that *defendant* found the victim's daughter in Cichowski's bathroom. Rather, the uncontroverted record is that the victim found both her very drunk daughter and defendant in Cichowski's bathroom.

### Evidence Admissible

Neb. Rev. Stat. § 27-401 (Reissue 1985) defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Recently, in *State v. Oliva*, 228 Neb. 185, 422 N.W.2d 53 (1988), this court considered and rejected an argument virtually identical to the one now made by defendant, noting:

> The argument is not that the evidence fails to address a material issue . . . but that the evidence is so lacking in probative force that it should have been excluded. The modern view, however, is that evidence is probative if it tends in any degree to alter the probability of a material

fact. . . .

. . . It is enough if the evidence offered could show that a material fact is slightly more probable than it would appear without that evidence. . . .

. . . As we have said, § 27-401 requires only that the degree of probativeness be something more than nothing.

228 Neb. at 188-89, 422 N.W.2d at 55. The victim's testimony regarding her encounter with defendant on the night of June 6, 1986, is probative regarding the credibility of her statement, following the rape, that she had found her attacker's voice familiar; the victim's testimony clearly went to the material issue of identity. Similarly, testimony to the effect that the daughter did not reside, after June 9, 1986, in the apartment in which the rape took place went at least to the question of opportunity, making this "material fact [appear] slightly more probable than it would appear without that evidence." *State v. Oliva, supra* at 189, 422 N.W.2d at 55. Clearly, the testimony concerning which defendant complains was relevant to issues material to his prosecution and satisfied the requirements of § 27-401. Although there may have been some way to tell the story of that evening without mentioning the role played by the victim's daughter, we will not dwell on that mere possibility here, the admission or exclusion of evidence being a matter within the discretion of the trial court and one not to be disturbed on appeal absent an abuse of discretion. *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988); *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986).

## Evidence Not Unfairly Prejudicial

Defendant next asserts that the victim's testimony was, in any event, unfairly prejudicial under Neb. Rev. Stat. § 27-403 (Reissue 1985), and therefore should not have been admitted. The only discussion contained in defendant's brief concerning this second branch of his first assignment of error is the following conclusionary sentence:

Finally, if this Court finds these incidents relevant in some way to this case, the evidence should be excluded by *Neb.Rev.Stat.* §27-403 in that relevant evidence can be excluded if it's [sic] probative value is substantially

outweighed by "the danger of unfair prejudice, confusion of the issues . . ." §27-403 (Reissue 1985). Brief for Appellant at 17. Defendant does not tell us how admission of evidence regarding the victim's daughter might have unfairly prejudiced his case, nor how it might have contributed to confusion of the issues; defendant's bald and conclusionary assertion does not rise to the level of "discussion" contemplated by the rule that this court will not consider assignments of error which are not discussed in the brief. *State v. Bonczynski,* 227 Neb. 203, 416 N.W.2d 508 (1987). We nonetheless elect to consider the matter in the interest of completeness.

Under § 27-403, relevant evidence is to be excluded if, among other things, there is a danger of unfair prejudice. *State v. Nesbitt,* 226 Neb. 32, 409 N.W.2d 314 (1987). In the context of § 27-403, "unfair prejudice" means a tendency to suggest a decision on an improper basis. *State v. Wilson, supra.*

While it is true that the circumstances of the discovery of defendant closeted in a bathroom with a drunk 14-year-old girl may raise inferential questions regarding impermissible issues, such as the defendant's character for sexual criminality or his motives in that particular situation, no attempt was made at trial to adduce evidence concerning any liberties the defendant may have taken then or at any other time with the young girl, nor with any person other than the victim. Upon review of the evidence adduced at trial, it is clear that the victim's daughter played only an extra's bit part in this unfortunate drama, mention of her largely being confined to the necessary explanation of the victim's first encounter with defendant. Under these circumstances, it cannot be said that admitting the evidence was unfairly prejudicial such as to constitute an abuse of the trial court's discretion. Defendant's first assignment of error is therefore without merit.

### EVIDENCE CONCERNING SILENCE

Defendant next claims as error the district court's receipt, over his objection, of evidence "regarding his pre-arrest silence." Once again, we must note that defendant's characterization of the evidence is not accurate; it is clear that his refusal to discuss R.L.'s rape with Hoch did not occur prior

to an arrest but, rather, occurred when he was under arrest on outstanding traffic warrants.

As this court recently noted in *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988) (*Lofquest II*), prosecutory references to a defendant's silence, which possibly includes a period of time after the *Miranda* warnings were given, violate the principles of *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which holds that U.S. Const. amend. XIV prohibits prosecutors from using post-*Miranda* silence to impeach an exculpatory story told for the first time at trial. Furthermore, although, theoretically, violation of a defendant's *Doyle* rights at trial may be harmless error if the record demonstrates the absence of harm beyond a reasonable doubt, *Lofquest II, supra*, this court has also stated that violations of the principles of *Doyle* are rarely harmless error in cases where it becomes the word of a defendant against the word of a key prosecution witness, and the matter of the defendant's credibility is so significant that prosecutory error attacking that credibility cannot be harmless beyond a reasonable doubt. *Lofquest II, supra*.

In *Lofquest II*, as in defendant's case,

> there were no eyewitnesses to the attack on the victim. This was certainly a case where the defendant's credibility as a witness played a major role in the jury's evaluation of the veracity of his story. The prosecutor's comments during trial and in closing could not be said to constitute an inconsequential passing remark regarding appellant's silence. The jury was allowed to consider these comments fully, after a defense objection which was overruled, and obviously no curative instruction was given. (See *Greer v. Miller*, ___ U.S. ___, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987), where a single question, an immediate objection, and two curative instructions did not constitute a *Doyle* violation, and such attempted *Doyle* violation was harmless beyond a reasonable doubt.)
>
> Federal circuit court cases have noted, "Because the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception." . . . For the above-stated reasons, we hold that

the *Doyle* violations in this case were so egregious and prejudicial that they were not harmless beyond a reasonable doubt, and a reversal is required.

(Citations omitted.) 227 Neb. at 571, 418 N.W.2d at 597-98.

As this court observed in *State v. Lofquest*, 223 Neb. 87, 89, 388 N.W.2d 115, 117 (1986) (*Lofquest I*):

If the defendant was advised of his rights immediately upon arrest and the prosecutor's remarks refer to his postarrest, post-*Miranda* silence, then *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), governs, and defendant's due process rights under the 14th amendment may have been violated by the prosecutor's actions. If the defendant was not immediately advised of his *Miranda* rights upon arrest and the prosecutor's remarks refer to postarrest, pre-*Miranda* silence, then defendant's due process rights may not have been violated. *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), requires a showing of the time the *Miranda* warnings were administered, since questioning a defendant about his postarrest, pre-*Miranda* silence is not unconstitutional. Finally, if the prosecutor's comments refer to the defendant's *prearrest* silence, then *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981), is applicable.

(Emphasis in original.) The State argues that defendant's reference to his silence as "prearrest" in his brief is somehow conclusive of the issue. This cannot be, and is not, the case. Review of a criminal conviction in a jury trial is not de novo in this court, and this court is bound by the facts as found by the jury, based upon the evidence adduced at trial. As we have noted many times, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. *State v. Moreno*, 228 Neb. 210, 422 N.W.2d 56 (1988); *State v. Eichelberger*, 227 Neb. 545, 418 N.W.2d 580 (1988).

Furthermore, although it may be argued that the cases cited above are distinguishable in that defendant, when he declined to discuss R.L.'s rape with Hoch, was under arrest on outstanding traffic warrants rather than in connection with the

crime which he declined to discuss, we find no authority, nor does the State direct us to any, which supports its implicit proposition that the State must observe constitutional provisions when questioning a suspect under arrest about the crime for which he has been arrested, but may disregard those same constitutional protections when putting to the suspect questions about other crimes. In fact, the U.S. Supreme Court has recently determined otherwise. *Arizona v. Roberson*, 56 U.S.L.W. 4590 (U.S. June 15, 1988) (No. 87-354), held that when a suspect is in custody for a crime in connection with which he has expressed a desire to remain silent, the police may not initiate interrogation concerning a different crime. In sum, a prosecutor may not refer to a criminal defendant's postarrest, post-*Miranda* silence. *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982); *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Moreover, any ambiguity regarding precisely when the defendant declined to talk to the police impermissibly taints evidence of the defendant's silence. *Lofquest I*; *Lofquest II*.

As noted earlier, the admission or exclusion of evidence is a matter within the discretion of the trial court and one which will not be disturbed on appeal absent an abuse of discretion. It is, however, an abuse of discretion to admit testimony regarding a criminal defendant's constitutionally protected silence when the record contains no evidence establishing that the silence did not occur following the giving of the *Miranda* warnings following an arrest, *Lofquest II*, error which we cannot say to have been harmless beyond a reasonable doubt, particularly in view of the fact the pubic hair samples and serology tests do not distinguish between defendant and his brother, on whom suspicion originally focused. *State v. Oliva*, 228 Neb. 185, 422 N.W.2d 53 (1988). The record therefore sustains defendant's second assignment of error.

## DECISION

Accordingly, we have no alternative but to reverse defendant's conviction and remand the cause for a new trial.

REVERSED AND REMANDED
FOR A NEW TRIAL.

BOSLAUGH, J., dissenting.

In view of the scientific evidence concerning the defendant's blood type, I believe the error concerning testimony regarding the defendant's silence was harmless beyond a reasonable doubt.