IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. LOVE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

BRYAN M. LOVE, APPELLANT.

Filed June 12, 2018.    No. A-17-230.

Appeal from the District Court for Saunders County: MARY C. GILBRIDE, Judge. Affirmed.

Jonathan M. Frazer, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Bryan M. Love was found guilty of assaulting a peace officer, obstructing a peace officer, and resisting arrest following a jury trial in the district court for Saunders County. Love appeals certain evidentiary rulings and the denial of his motion to dismiss the obstruction charge. He also challenges the denial of his request for jury instructions on self-defense and the reasonable use of force by an officer. Finding no error, we affirm.

## BACKGROUND

Love was involved in an altercation outside of the police station in Ashland, Nebraska, on August 20, 2015. Love was arrested and taken into custody by Ashland Police Officer Sterling Hitch and Nebraska State Patrol Trooper Andrew Phillips. Love was subsequently charged by amended information with assault on an officer in the third degree, obstructing a peace officer,

- 1 -

resisting arrest, and possession of a deadly weapon (other than a firearm) during the commission of a felony.

Love filed four motions in limine, including one to redact a portion of a video recording of his "interactions with law enforcement" on August 20, 2015. Love's motion sought to remove "all portions of video footage prior to [Love] being contacted by law enforcement in person." The State also filed a motion in limine to "prohibit [Love] from commenting in any manner, in voir dire, opening statements or closing arguments, or from eliciting testimony from any witness regarding any mental health or other disability or diagnosis unless and until the defendant testifies."

In an order filed on August 23, 2016, the court granted the State's motion in limine and prohibited Love's counsel from "mentioning an alleged diagnosis of Asperger's disease until [Love] himself testifies." Love did not have an expert witness to provide testimony about his mental health at that time. The court also overruled Love's motion in limine to have part of the surveillance video redacted.

On September 1, 2016, Love filed a notice of expert witness stating his intent to present testimony at trial from Dr. Melinda Pearson, a licensed psychologist. Love also filed a motion to reconsider the order on the motion in limine regarding testimony on Love's alleged diminished capacity. The State subsequently filed a second motion in limine regarding the evidence of Love's diagnoses in light of Dr. Pearson's testimony. The State moved the court to prohibit Love from commenting in any manner, in voir dire, opening statements or closing arguments, or from eliciting testimony from any witness, expert or lay, regarding any mental health or other disability or diagnosis, or diminished capacity, unless and until Love established that a causal connection existed between any mental health diagnosis and Love's claimed diminished capacity. The State also requested that the causal connection be established outside the presence of the jury prior to trial.

At the hearing on Love's motion to reconsider and the State's second motion in limine, Dr. Pearson testified that she was privately retained by Love to conduct an assessment of him. As part of her assessment, she reviewed a previous psychological evaluation from 2008, the criminal complaint against Love, and an incident report from August 2015; she also conducted three in-person interviews with Love. She diagnosed Love with "persistent depressive disorder, severe; generalized anxiety disorder; autism spectrum disorder without intellectual disability; problems with social communication requiring substantial support; and inflexibility of behavior requiring substantial support – or very substantial support; intermittent explosiveness disorder; alcohol use disorder and Cannibis [sic] use disorder." Dr. Pearson's testimony was that "sensory overload" is one of the effects of autism spectrum disorder and that "it is possible [Love] was experiencing sensory overload when encountering Officer Hitch." However, she also agreed that it was possible Love was "just mad."

Dr. Pearson also stated that Love indicated an "unusually high endorsement of symptoms, not unusual in circumstances where an individual perceives the results may positively impact their desired legal outcome," which she confirmed meant that it was possible Love was faking his symptoms to positively impact his case. She also agreed that even with her diagnoses for Love, he was still able to distinguish right from wrong, make decisions about how to respond to individuals,

follow instructions and comply, and make choices about how he behaves. However, she said that persons with autism spectrum diagnoses may not be able to control their response to stimuli, specifically including the case of sensory overload.

In an order filed on November 15, 2016, the district court noted Dr. Pearson's testimony that Love functions on the autism spectrum, but that this did not impair his intellectual function but may impact his social functioning. "She was unable to provide evidence of the connection between this disorder and his claim of diminution of capacity at the time this event occurred." The court stated that Dr. Pearson was "unable to conclude [Love's] disorder prevented him from forming the requisite general intent, and moreover testified that, in her opinion, it was possible [Love] was faking his symptoms." The court concluded such evidence did "not tend, logically and by reasonable inference, to prove" that Love was incapable of having the required level of culpability and was therefore inadmissible. The order prohibited Love from mentioning "autism, Asperger's disease, or similar condition during voir dire or opening argument." However, Love's counsel was not precluded from questioning the arresting officer about his observations of Love's behavior before and during the incident, nor was Love precluded from testifying about his state of mind during the incident. The order also allowed Love's counsel to "argue conclusions from the evidence presented."

TRIAL

A jury trial commenced on November 16, 2016. Officer Hitch testified about his encounter with Love on August 20, 2015. When Officer Hitch arrived at the Ashland police station that evening, the officer going off duty informed him that Love might be coming to the station for a "civil standby." Officer Hitch had previous contact with Love, and had a good rapport with him. He was aware of what vehicle Love drove, and had not seen it in the parking lot when he arrived.

Officer Hitch heard a vehicle arrive, and the other officer informed him that Love had arrived. Officer Hitch went to the door and was met by Love. Love told him he wanted a civil standby, and Officer Hitch told Love he would be there in a moment after he "finish[ed] his pass" with the other officer going off duty. About one minute later he went back outside and saw Love sitting on a bench in front of the police department. Love told him he wanted to retrieve some documents and wanted a civil standby. Officer Hitch observed the odor of alcohol on Love, and also noticed his eyes were bloodshot. Officer Hitch asked Love if he had been drinking, and Love stated he had hours prior to their conversation, but he had taken a long nap and said he was now sober. According to Officer Hitch, Love insisted that he administer a preliminary breath test (PBT) on him to show he was sober. Officer Hitch stated at that point Love was "compliant, pretty relaxed." When Love saw the result of the PBT, his demeanor changed entirely and he began to walk away from Officer Hitch. This alarmed Officer Hitch because Love had always been compliant in their previous interactions.

Officer Hitch said he intended to begin investigating Love "for [driving under the influence]" (DUI) based on the PBT and his understanding that Love had driven to the station. When Officer Hitch asked Love whether he drove his vehicle there, Love initially said no, but when Officer Hitch told him about the cameras on the building, Love admitted he drove there. Officer Hitch asked Love if he had been drinking in the parking lot. Love denied doing that and began walking towards his vehicle to show Officer Hitch there was no alcohol there. Officer Hitch

told Love to stop, which Love did not do. Officer Hitch gave Love another command to stop, which Love ignored as he opened the door to his vehicle. Officer Hitch stated he was concerned Love might have a weapon in his vehicle. Love continued to ignore Officer Hitch's commands to stop, and Love told Officer Hitch he was going to make a phone call. Officer Hitch told Love to put the phone down because he did not want Love to make any phone calls, which he testified can be a threat to officer safety.

Love continued to ignore Officer Hitch's commands to put down the phone. Love eventually leaned against the city office building in an upright position but with bent knees almost in a seated position, and picked his phone up again and began dialing a number. Officer Hitch instructed him yet again to put his phone down, which Love refused to do. Officer Hitch felt Love's position would make it easy for Love to lunge at him, which made Officer Hitch nervous because Love was not complying with any of Officer Hitch's instructions. Officer Hitch then physically moved Love onto the ground, putting him on his hands and knees, and called for immediate backup over his radio. Love continued to attempt to make his phone call from the ground; Officer Hitch stated at that point he intended to arrest him for obstructing the DUI investigation. Love "balled up with his hands under his chest" and was shouting at the phone, which was out in front of him "on speaker [phone]," that he was going to jail. Officer Hitch attempted to use a pressure point control tactic to get one of Love's arms back to handcuff it, but Love began to flail, and "forced up quickly" while Officer Hitch tried to hold him down. Officer Hitch could not hold Love down due to Love's size and they began to wrestle. Officer Hitch repeatedly told Love to stop fighting and give him his hands.

Love and Officer Hitch continued to wrestle, but eventually Love got up and stated he was going to leave. Officer Hitch then told Love twice he was going to use his Taser on him, to which Love responded "go ahead and Tase me." Love stood up and moved to the passenger side of his pickup, and opened the door. Officer Hitch drew his Taser and used it on Love, which caused him to "go down on the bench seat of his pickup and lay on his pickup" but he did not stop resisting. Officer Hitch saw the keys were in the ignition of the pickup, and instructed Love to get out of the vehicle again, which Love refused to do. Officer Hitch then used his Taser on Love again, and Love got out of the pickup. Officer Hitch instructed Love to lay down, which he did. Officer Hitch approached Love, knelt down next to him, and retrieved his handcuffs. However, as Officer Hitch put the Taser down, Love pulled out one of the two Taser prongs (both are required for the Taser to work) and Love was able to quickly spring back up and start towards his vehicle. Officer Hitch attempted to restrain him again, and they began to wrestle. Officer Hitch then sprayed his pepper spray at Love's eyes. Love went towards his vehicle, and Officer Hitch tried to restrain him from behind. Love began kicking him, and Officer Hitch got into the pickup with Love because Love attempted to start it. Officer Hitch testified that during the whole altercation he was instructing Love to quit fighting.

After Officer Hitch was able to get the keys out of the ignition, he exited the pickup through the passenger side door. Officer Hitch put the keys in his pocket and Love exited the vehicle as well, and went around to the driver's side. Officer Hitch said they were both very winded at that point, but Love was not grabbing his chest or indicating he needed emergency help; Love did take a drink of water.

Love then opened the driver's side door of the pickup, and reached across the seat to open the glove box and retrieved a utility knife. The blade was "open" and Officer Hitch told Love to put the knife down. Officer Hitch asked Love what he was going to do with the knife, and Love put the knife in his pocket and then "made a gesture motion, like, he was going to cut his wrists" which alarmed Officer Hitch. Officer Hitch stated he was worried at the time that Love was going to attempt "suicide by cop," which he described as a person intentionally becoming a threat to an officer with the purpose of the officer ending the person's life. For that reason, Officer Hitch did not draw his weapon, though he believed he would have been justified in doing so at that point. Officer Hitch left Love on the other side of the pickup and did not draw his weapon because he heard sirens and knew his backup would soon be arriving to help.

When Trooper Phillips arrived on the scene, Officer Hitch informed him that Love had a knife. Trooper Phillips instructed Love to get on the ground and approached him from the back of the pickup. Officer Hitch began to approach Love from the front of the pickup. Love ignored Trooper Phillips' instructions to get on the ground twice, and Trooper Phillips struck Love with a baton in the right thigh. Love fell to the ground, and Officer Hitch and Trooper Phillips arrested him. Officer Hitch testified that at the time he did not think Love was going to the ground when Trooper Phillips approached him, but after reviewing the video it looked like Love began to bend his knees at the same time Trooper Phillips was swinging the baton.

Officer Hitch testified he noticed two witnesses watching the incident: the city administrator and a grocery store manager (who was unknown to Officer Hitch at the time). At some point while Officer Hitch was wrestling with Love, Officer Hitch kicked his boot knife away towards the city administrator after it fell out of his boot; Officer Hitch testified the boot knife was his and did not come from Love.

The incident between Officer Hitch and Love was captured by video surveillance. Officer Hitch explained that the Ashland Police Department has a surveillance system with two cameras on the police station building that record but also have a display that shows a live stream from the cameras. The cameras do not record continuously, but instead record successive 30- or 45-second clips and occasionally there is a brief lapse in recording between two clips. The surveillance system was operating on August 20, 2015. During Officer Hitch's testimony, the State played the unredacted surveillance video taken from the surveillance system, which was recording from the time Love arrived at the police station until after his arrest.

According to Officer Hitch, he had been instructed on how to deal with people who are belligerent, intoxicated or suffer from mental or behavior disorders as part of his training as a police officer. He was trained to try to talk such people into compliance before attempting to force them into compliance, but he said they are more difficult to persuade. Officer Hitch stated Ashland's police department is small, so he has to take any calls that come in because he is the only officer on duty. If he needs backup, it comes from either the Saunders County Sheriff's Office or the State Patrol, and they are typically at least 10 minutes away. Because he does not have immediate backup, he tries to talk people into compliance before using force because he would be fighting alone for a long time. Prior to arresting Love, Officer Hitch had never used his Taser or pepper spray, though he had previously used force to put a person in handcuffs.

Trooper Phillips testified he was in uniform and on patrol on August 20, 2015, when he was dispatched to help an Ashland police officer who was fighting with a suspect. It took Trooper

Phillips between 3 and 5 minutes to arrive, and when he pulled into the parking lot he saw Officer Hitch on the passenger's side of a pickup and Love on the driver's side. As Trooper Phillips approached he could see that both Officer Hitch and Love looked exhausted. Officer Hitch informed Trooper Phillips that Love had a knife. Trooper Phillips gave Love two verbal commands to get on the ground, but Love ignored the commands and glared at Trooper Phillips. Trooper Phillips took out his baton and struck Love on the side of the leg in the thigh. Love immediately fell to the ground and Officer Hitch and Trooper Phillips arrested him. Trooper Phillips believed Love was either attempting to turn and run or to deflect the strike to his leg when Trooper Phillips struck him with the baton. After Love was handcuffed, Trooper Phillips noticed the odor of alcohol on Love.

The city administrator testified that she looked out the window when she heard some yelling, and she saw Officer Hitch and Love wrestling on the ground in front of the police station building. She asked Officer Hitch if he needed any help, and he responded that he had backup coming. The grocery store manager testified she was pulling out of the parking lot at the end of her shift when she noticed Officer Hitch and Love fighting on the sidewalk by the police station. She pulled into the police department parking lot and called 911 and waited in her car. Both these witnesses testified they saw Officer Hitch and Love wrestle around on the ground for a while, and then saw Love move over to his pickup. Both witnessed Officer Hitch use his Taser on Love, and both testified the Taser did not stop Love from struggling with Officer Hitch. Neither remembered seeing Love get pepper sprayed.

At the close of the State's evidence, Love moved for a directed verdict specifically as to the charge for obstructing a peace officer, but then moved to dismiss all counts. The court overruled the motion to dismiss, and Love proceeded with his defense.

Love testified he went to the police department because he wanted to get some documents from an old roommate. Officer Hitch initially asked him to wait outside the station, which he did. When Officer Hitch came back outside, Love was calm. Officer Hitch asked Love if he had been drinking and told Love his eyes were bloodshot. According to Love, Officer Hitch asked him if he would consent to a breathalyzer test. Love consented because he did not think he was impaired at all, though he had consumed alcohol earlier that day. After the PBT, Officer Hitch told Love he was going to jail, though he did not explain why, which confused Love. Love began to have trouble breathing and sat down on a bench because he was having a panic attack. He got up and went to his pickup to get his personal belongings. Love wanted to call his parents for advice so he took out his phone to make a call, but Officer Hitch told him he could not make the call. Eventually Love called his father, which he told Officer Hitch he was doing multiple times. Love was squatting down against a wall because he still felt he was having a panic attack. His father answered his call, but Officer Hitch tried to arrest Love at that moment. Officer Hitch "[took him] to the ground," and Love's phone slid across the concrete. They began to wrestle and Officer Hitch told Love to quit resisting. Love, who had experience as a wrestler, did not attempt to choke Officer Hitch or throw him, but did get his phone back. Love stated that while they were wrestling, Officer Hitch asked a witness to grab "his boot knife" which had fallen while he was wrestling with Love. Love did not know where the knife came from, but said it was not his.

Love testified Officer Hitch eventually used his Taser on him twice, and pepper sprayed him as well. While wrestling, they moved closer to Love's pickup and Love attempted to grab his

keys out of the pickup, but Officer Hitch grabbed them. Eventually Love exited the driver's side door and remained on that side of the vehicle. At some point after he and Officer Hitch had separated, Love grabbed a utility knife out of the pickup. Love said he did not know why he grabbed the knife, but he did not threaten Officer Hitch with it and he put the knife in his pocket. Trooper Phillips arrived and ordered Love to get down on the ground. Love was standing between his pickup and another parked vehicle with his hands on the hood of his pickup, smoking a cigarette. Trooper Phillips gave him a second command to get on the ground. Love put out his cigarette and stepped back to get on the ground, and Trooper Phillips struck him with a baton as he was going down.

At the close of the evidence, Love's counsel requested to make an offer of proof, outside the presence of the jury, regarding Dr. Pearson's testimony as to Love's diagnoses. The State objected and the court sustained the objection. Love's counsel also proposed jury instructions on self-defense and the standard of reasonableness of force a peace officer may use in Nebraska when conducting an arrest. The court ruled the evidence did not support either instruction. The jury then deliberated, and found Love was guilty of assault on an officer in the third degree, obstructing a peace officer, and resisting arrest. The jury found Love not guilty of the charge for possession of a deadly weapon (other than a firearm) during the commission of a felony, and this count was dismissed by the court after accepting the jury's verdict. Love was sentenced to probation for 24 months, subject to certain terms and conditions. Love appeals.

## ASSIGNMENTS OF ERROR

Love assigns the district court erred by (1) denying his motion in limine to redact the surveillance video offered by the State and not allowing the jury to view a redacted version of the video during their deliberations, (2) granting the State's motion in limine to restrict testimony regarding Love's mental health diagnoses, (3) denying Love's motion to dismiss at the close of the State's evidence with respect to the charge of obstructing a peace officer, and (4) not giving two of his requested jury instructions.

## STANDARD OF REVIEW

An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless the error was harmless beyond a reasonable doubt. *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

We review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony. *Id.* A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

Whether jury instructions given by a trial court are correct is a question of law. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id.*

## ANALYSIS

### SURVEILLANCE VIDEO

Love claims the district court erred by denying his motion in limine to redact the surveillance video offered by the State. Though Love's assignment of error refers to "exhibit 8," brief for appellant at 9, we note that exhibits 5 through 8 were photographs of injuries sustained by Officer Hitch as a result of the incident. Exhibit 4 was the surveillance video offered by the State, and was the only video admitted into evidence at trial. We therefore address Love's assignment of error as it pertains to exhibit 4. Love argues that "[t]he redacted video should have been admitted into evidence at trial in lieu of the full, unedited version the State offered, and the redacted video should have been made available to the jury during deliberations." Brief for appellant at 10.

With regard to admitting the unredacted video rather than his requested redacted video, Love cites to *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013), for the proposition that redaction may be the most effective way of excluding prejudicial evidence from the jury. In his brief on appeal, Love does not discuss how the unredacted video was prejudicial, but instead refers us to his pretrial argument on this issue. In his motion in limine, Love asserted that "[a] portion of such footage contains video that purports to show [Love] operating a motor vehicle, but the video feed was not being monitored by any individual at the time, and could not properly form the basis to begin a DUI investigation." Love requested that "all portions of video footage prior to [Love] being contacted by law enforcement in person be redacted." At trial, Love objected to the video because "[i]t contains portions of the surveillance that Officer Hitch did not see," and that portion is "without a foundational witness," so "it's not admissible." Love's objection to the unredacted video was therefore based on Officer Hitch's inability to lay foundation for admission of the first portion of the video which shows Love driving up to the police station, which Officer Hitch did not personally observe.

At trial, when the objection to the unredacted video was made by Love's attorney, the district court responded that the video was "taken by cameras that are installed at city hall." The court further noted there was already an admission on record that Love was driving. The State added that there was no driving under the influence charge in the case, and there were less than 30 seconds showing Love "pulling in, getting out of his truck" and then talking to Officer Hitch. In its brief on appeal, the State points out that Officer Hitch testified he works at the police department, that he had knowledge of the surveillance cameras affixed to the building which provide a live feed that is recorded, and that the video system was working on the date of the incident. Further, Office Hitch testified that he reviewed the video and it contained the incident at issue, and he also testified about many of the events captured on the video.

As also noted by the State in its brief, *State v. Anglemyer*, 269 Neb. 237, 691 N.W.2d 153 (2005), addresses the issue of sufficient foundation for admission of a videotape. In that case, the defendant similarly argued that videotapes should not be admitted without the testimony of a witness who actually saw the events depicted and could testify that the videotapes accurately represented what the witness saw. In *Anglemyer*, the police detective who participated in the execution of the search warrant which turned up the videotapes testified that the videotapes did not appear to be altered and were date-stamped. The Nebraska Supreme Court found that the

defendant's argument on this issue implicated rules on authentication, and under the "'silent witness' theory of admission, photographic evidence may draw its verification not from any witness who has actually viewed the scene portrayed, but from other evidence which supports the reliability of the photographic product." *Id*. at 244, 691 N.W.2d at 160. "The general rule . . . is that photographic evidence is admissible when it is shown that it is a correct reproduction of what it purports to depict." *Id*. at 246, 691 N.W.2d at 161. While often proved by the testimony of the one who took the photograph, this is not necessary, "and it is well settled that the showing may be made by any evidence that bears on whether the photographic evidence correctly depicts what it purports to represent." *Id*. at 246, 691 N.W.2d at 162. "The essential element is that the photographic evidence be verified or authenticated as a genuine representation of what it purports to depict [and] it is not required that an eyewitness be produced where other evidence is available to accomplish the same end." *Id*. Also, "it is well established that the same evidentiary principles apply to videotapes." *Id*. at 247, 691 N.W.2d at 162.

In the present case, based on the testimony of the witnesses, it was conclusively shown that the videotape correctly represented and depicted the altercation, which was preceded by a very brief video depiction of Love pulling up to the police station in his vehicle. There was sufficient foundation to support that the videotape was a genuine representation of what it was purported to depict, and therefore, the district court did not abuse its discretion in admitting the unredacted surveillance videotape and denying Love's request to receive only a redacted version.

Love also asserts the district court erred by "not allowing the jury to review a redacted exhibit [4] as a non-testimonial exhibit during deliberations." Brief for appellant at 9. However, our review of the record shows that although a redacted video was produced and marked as exhibit 1 at a pretrial hearing, the court overruled Love's request to use the redacted version of the video. This exhibit was never received as evidence at trial, and therefore could not be considered by the jury regardless of its classification as testimonial or nontestimonial evidence. A fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

Therefore, the only video available for the jury to potentially review during deliberations was the unredacted video, and we consider Love's argument in relation to the admitted video. Love challenges the district court's comment that the video constituted testimonial evidence and could not be submitted to the jury during deliberations, however, Love does not provide any argument as to why this statement was in error, and if it was, how that prejudiced him. There was certainly no error by the district court in stating that testimonial evidence should not be submitted to a jury during deliberations. See *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017) (trial court does not have discretion to submit testimonial materials to jury for unsupervised review, but trial court has broad discretion to submit to jury nontestimonial exhibits, in particular, those constituting substantive evidence of defendant's guilt). However, Love contends the video was not testimonial and should have been made available to the jury during deliberations.

In *State v. Wofford, supra*, the Nebraska Supreme Court concluded the video surveillance in that case was not testimony, but was instead a nontestimonial exhibit that constituted substantive evidence of the defendant's guilt, and that the district court had broad discretion to submit the video to the jury for use during deliberations. In the present matter, even if the video surveillance was a nontestimonial exhibit which corroborated other evidence, and the district court could have

permitted access to the video during deliberations, the record does not reflect that Love insisted on the jury having access to the unredacted video during deliberations. Once the court agreed to Love's request to be able to play the video again during cross-examination, the matter was dropped. And during the conference on jury instructions, the court stated "the video won't go back," to which both the State's attorney and Love's attorney stated, "[N]o objection." A trial court cannot commit error in resolving an issue never presented and submitted to it for disposition. See *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012).

## LOVE'S DIAGNOSES

Love contends the district court erred by granting the State's motion in limine prohibiting testimony regarding Love's behavioral and mental health diagnoses. As discussed above, the court's November 15, 2016, order prohibited Love from mentioning "autism, Asperger's . . . or similar condition during voir dire or opening argument." However, Love was not precluded from questioning Officer Hitch about his observations regarding Love's behavior prior to and during the incident; nor was Love precluded from testifying about his state of mind during the incident. The defense was also permitted to argue conclusions from the evidence presented. Because a motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury, it is not the office of such a motion to obtain a final ruling upon the ultimate admissibility of the evidence. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). A question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection or offer of proof during trial. *Id.*

Love's counsel did not attempt to question any witness during the trial regarding Dr. Pearson's diagnoses of Love. However, Love made an offer of proof at the close of his evidence that Dr. Pearson's trial testimony would have been similar to her prior testimony, but that she had now viewed the surveillance video and could "point to specific things, specific points in the video [and say] based on my diagnosis of him and his autism, in this scenario, he would have felt threatened . . . he could have been confused." The court sustained the State's objection to this offer of proof.

Love contends the trial court erred in disallowing testimony on Love's autism spectrum diagnosis, as this would have allowed Love "to testify and fully explain his mental condition on the day he was arrested." Brief for appellant at 13. Love claims his diagnoses, "specifically with regard to the autism spectrum disorder, all bear upon his mental condition at the time of the offense, and should have been allowed to be presented to the jury." *Id.* at 11-12. He argues that Dr. Pearson described the accepted methods used when evaluating Love, and she described "very specific observations she made of [Love], such as psychomotor agitation, tangential and circumstantial responses, the need to repeat questions to him, above-average volume of voice at times, and a labile affect." *Id.* at 11. Love also points out Dr. Pearson's observation of executive dysfunction, or Love not being able to adjust when a situation is not unfolding as Love might expect.

Love takes issue with the district court concluding that the evidence provided by Dr. Pearson lacked a causal link between Love's diagnoses and his ability to form the requisite intent. He claims the district court "placed a burden on [Love] that, absent testimony that he was incapable of forming the intent necessary to be convicted on the pending charges, zero testimony would be

allowed about his actual capability to form any intent, or details that might present as mitigating factors to the jury." *Id.*

To be admissible, an expert's opinion must be based on good grounds, not mere subjective belief or unsupported speculation. *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016). A trial court should not require absolute certainty in an expert's opinion, but it has discretion to exclude expert testimony if an analytical gap between the data and the proffered opinion is too great. *Id.*

> In determining whether an expert's testimony is admissible pursuant to the Nebraska Evidence Rules, a court considers four preliminary and interrelated questions: (1) Does the witness qualify as an expert pursuant to Neb. Evid. R. 702? (2) Is the expert's testimony relevant? (3) Will the expert's testimony assist the trier of fact to understand the evidence or determine a controverted factual issue? (4) Should the expert's testimony, even though relevant and admissible, be excluded in light of Neb. Evid. R. 403?

*State v. Reynolds*, 235 Neb. 662, 679-80, 457 N.W.2d 405, 417 (1990).

In *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988), the defendant sought to have a psychiatrist testify that at the time he stabbed the victim in that case, the defendant was suffering from an anxiety-ridden neurosis which caused him to panic, and that the defendant then acted out of self-defense. The defendant claimed the failure to admit this testimony was error, as it "bore on his lack of intent to commit the crime." *Id.* at 527, 423 N.W.2d at 438. The Nebraska Supreme Court concluded, "In truth and fact, the evidence at issue amounted to nothing more than a statement by the psychiatrist that, considering all the circumstances, he believed [the defendant's] claim that he acted out of fear for his own safety." *Id.* at 528, 423 N.W.2d at 439. The Supreme Court concluded the jury was capable of evaluating the circumstances surrounding the crime, without expert advice, as to whether the defendant reasonably feared for his life.

A similar situation exists here, in that Dr. Pearson could only speculate as to Love's actual mental processes at the time of incident. The strongest statement Dr. Pearson made was "it is possible [Love] was experiencing sensory overload when encountering Officer Hitch," and that "he would have felt threatened . . . he could have been confused." She also stated that persons with autism spectrum diagnoses may not be able to control their response to stimuli in the case of sensory overload. But she also said it was possible that Love was "just mad." Dr. Pearson was not able to testify that Love's diagnoses limited his ability to make good decisions and effectively regulate his behavior on the day of the incident. Dr. Pearson was unable to say that Love did not intend to commit any of the crimes he was charged with or that he could not have formed the requisite intent to do so because of his diagnoses. In fact, Dr. Pearson agreed that even with her diagnoses for Love, he was still able to distinguish right from wrong, make decisions about how to respond to individuals, follow instructions and comply, and make choices about how he behaves.

Additionally, Love testified about having panic attacks, asthma, and being easily confused. He was able to adduce evidence as to his mental state at the time of the incident, and he said he was confused. But on cross-examination by the State, he acknowledged that he understood clear commands, such as "[g]et on the ground," "[g]ive me your hands," "[s]top fighting," "[s]top resisting," "[c]ome here," "[p]ut down your phone," and "[s]tay here." He said shortly after the PBT, he started having a panic attack, but admitted he heard Officer Hitch say, "[s]top resisting" and "[g]et on the ground." Love's plan was to call a parent because they help calm him down from

- 11 -

a panic attack. The State asked Love, "Did it occur to you that the plan to end all this was to obey any one of the simple commands that Officer Hitch gave you?" Love responded, "It could have." Based on the record before us, we cannot say the district court abused its discretion by excluding Dr. Pearson's testimony. We agree that her testimony failed to establish a causal link between Love's diagnoses and his ability to form the requisite intent to commit the crimes for which he was convicted.

### MOTION TO DISMISS

Love assigns the court erred by denying his motion to dismiss at the close of the State's evidence, specifically with respect to the charge of obstructing a peace officer. However, we note that a defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for dismissal or a directed verdict but may still challenge the sufficiency of the evidence. *State v. Combs*, 297 Neb. 422, 900 N.W.2d 473 (2017).

Love's counsel moved the court to dismiss all charges against him at the close of the State's case in chief. The court overruled his motion, and Love then offered his own testimony. Love therefore waived his right to challenge the court's denial of his motion for dismissal at the close of the State's evidence, but we can consider Love's argument challenging the sufficiency of the evidence to support his conviction for obstructing a peace officer.

Neb. Rev. Stat. § 28-906 (Reissue 2016) provides, in relevant part:

(1) A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders (a) the enforcement of the penal law or the preservation of the peace by a peace officer . . . acting under color of his or her official authority[.]

Love argues that the State "offered no credible evidence" that Love physically obstructed Officer Hitch from doing any lawful act "prior to the scuffle," or that Love "threatened to physically obstruct Officer Hitch from doing any lawful act at all." Brief for appellant at 15. Love claims Officer Hitch arrested Love before he was obstructed from doing anything. However, the jury could certainly view the evidence differently.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016). An appellate court does not resolve conflicts in the evidence, pass on credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id.*

We have set forth the evidence in detail previously, and conclude there was sufficient evidence for the jury to conclude that Love physically interfered or otherwise intentionally obstructed or impaired Officer Hitch's ability to conduct an investigation and preserve the peace. As pointed out by the State in its brief, a person who resists being handcuffed and struggles with an officer after being informed of being under arrest can be convicted of both resisting arrest and

obstructing a peace officer. See *State v. Campbell*, 260 Neb. 1021, 620 N.W.2d 750 (2001). See, also, *In re Interest of Richter*, 226 Neb. 874, 415 N.W.2d 476 (1987) (physical obstacle interposed by act of running away obstructed, impaired, or hindered officers' efforts to preserve peace in violation of § 28-906). Love repeatedly refused to follow commands in the course of Officer Hitch's investigation, and when Officer Hitch attempted to put handcuffs on Love, he sprang up and moved away from Officer Hitch to go to his truck where further struggles between Love and Officer Hitch took place, including Love's attempt to start the vehicle. After viewing the evidence in the light most favorable to the prosecution, the jury could have found the essential elements of the crime beyond a reasonable doubt.

## JURY INSTRUCTIONS

Love assigns the district court erred by not giving his requested jury instructions regarding self-defense and the standard for the reasonableness of force a peace officer may use in Nebraska when conducting an arrest pursuant to Neb. Rev. Stat. § 28-1412 (Reissue 2016). He claims "the evidence was clear that Officer Hitch struck [Love] and tackled him on concrete before he ever made any request for [Love] to give him his hands or submit to handcuffs." Brief for appellant at 16. "At every stage in the attempted arrest, it was Officer Hitch escalating things to the next level of force, too quickly, and too far for what the facts warranted." *Id*. Without the requested jury instructions, Love claims the jury had no way of knowing whether Officer Hitch exceeded an authorized level of force, and the jury was not given an opportunity to consider whether Love "acted reasonably in his own self-defense." *Id*. at 17. He contends there were sufficient facts for the jury to be instructed on both self-defense and the reasonableness of use of force by peace officers. We disagree.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). In prosecutions for assaulting an officer, obstructing a peace officer, or resisting arrest, a trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim that the police officer used unreasonable force in making the arrest. *State v. Yeutter*, 252 Neb. 857, 566 N.W.2d 387 (1997).

When this issue was discussed during the jury instruction conference, the district court relied on *State v. Yeutter, supra*, to deny the requested instructions. Like Love, the defendant in *Yeutter* was convicted of third degree assault on an officer, obstructing a peace officer, and resisting arrest. The Nebraska Supreme Court considered whether the defendant was entitled to an instruction on self-defense and concluded the defendant failed to adduce any evidence which raised a legally cognizable claim that the police officer used unreasonable force in making the arrest. As a result, the defendant was not entitled to a self-defense instruction. The Nebraska Supreme Court stated, "To successfully assert the claim of self-defense, one must have a . . . reasonable and good faith belief in the necessity of using force," and "the force used in defense must be immediately necessary and must be justified under the circumstances." *Id*. at 862-63, 566 N.W.2d at 391. Further, "a police officer, in making an arrest, must use only reasonable force, which is that amount of force which an ordinary, prudent, and intelligent person with the knowledge and in the situation

of the arresting police officer would have deemed necessary under the circumstances." *Id*. at 863, 566 N.W.2d at 391.

In *Yeutter*, the police officer did not take the defendant to the ground until the defendant twice refused to put his hands on the vehicle as ordered. Love argues that Officer Hitch struck Love and tackled him before he ever made any request that Love submit to handcuffs. Love asserts that his disregarding Officer Hitch's order to put his phone down was not illegal and that he only took actions "absolutely necessary to remove the restriction on his breathing, by standing up and removing Officer Hitch's hands from his neck." Brief for appellant at 17.

Contrary to Love's assertions, we agree with the district court that there was no evidence that Officer Hitch used unreasonable force against Love. To the contrary, the evidence shows that Love refused repeated commands throughout the entire altercation. Love failed to comply with Officer Hitch's multiple commands to stop attempting to walk away from him, to stay away from his pickup, and to stop using or attempting to use his phone. After Officer Hitch attempted to arrest Love, Love wrestled with Officer Hitch and refused to comply for several minutes. Officer Hitch testified he continuously instructed Love to cease resisting the arrest. Officer Hitch also testified he did not apply pressure points to Love until he refused to allow Officer Hitch to handcuff him, kept his hands underneath his chest, and then wrestled with Officer Hitch. Officer Hitch used his Taser on Love twice, but only after Love wrestled away from him, stood up and told Officer Hitch he was leaving, and went to his pickup again. Officer Hitch warned Love he would use his Taser, but Love responded "go ahead and Tase me." Despite a short period of compliance after Officer Hitch used his Taser twice, Love continued to resist Officer Hitch and stood back up and attempted to get back into his pickup when Officer Hitch put down the Taser. Even after being pepper sprayed, Love continued to wrestle with Officer Hitch, and eventually went to the opposite side of the pickup. After Trooper Phillips arrived on the scene, Love still did not immediately comply with instructions to get on the ground until Trooper Phillips used his baton.

Love's requested jury instructions on self-defense and the standard of reasonableness of force a peace officer may use when conducting an arrest were not warranted by the evidence.

CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED.